# Exhibit A

## SAILING YACHT PURCHASE AGREEMENT

Dated as of the <u>23</u><sup>rd</sup> day of May 2023

between

**Distant Horizons LLC**
as SELLER,

and

**MS Management LLC**
as BUYER,

and

**GL Yachting USA Inc**
as Escrow Agent

concerning one Gunboat 68 sailing yacht bearing

Registry Number JMP19052
With Flag and Port of Registry Montego Bay, Jamaica

and  HIN: FR-GUN68002F919

DS
PPH

1


DocuSigned by:
Michael Stock
53AC906B78FB45A...

DocuSign Envelope ID: 32E16606-E1FA-4A0C-B12B-39FB3CED593D

## SAILING YACHT PURCHASE AGREEMENT

This **SAILING YACHT PURCHASE AGREEMENT** (this "Agreement") is made and entered into as of the 23rd Day of May 2023 (the "Effective Date"), by and between:

**Distant Horizons LLC**, a Delaware limited liability company, with an address at 251 Little Falls Drive Wilmington, DE, 19808 USA as ("SELLER")

And

**MS Management LLC.** a Delaware Limited Liability company, with an address at 16192 Coastal Highway Lewes, DE 19958, USA as ("BUYER")

And

**GL Yachting USA Inc**, a Delaware Corporation, with an address at 1 Washington Street Newport, RI 02840 as ("Escrow Agent").

### W I T N E S S E T H:

WHEREAS, SELLER is the sole legal owner of the Sailing Yacht (defined below), has the right to convey the Sailing Yacht and desires to sell the Sailing Yacht to BUYER in accordance with the terms and conditions set forth in this Agreement; and

WHEREAS, BUYER desires to purchase the Sailing Yacht from SELLER in accordance with the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual agreements, covenants and promises set forth herein, the parties hereto, intending to be legally bound, hereby agree as follows:

1. Definitions.

As used in this Agreement and in the Exhibits attached hereto:

**"Sailing Yacht or Vessel"** means (i) that certain Gunboat 68, with HIN: FR-GUN68002F919, registered in Montego Bay, Jamaica as "Dash", with registration number JMP19052, detailed in Exhibit A including together with (i) all systems, sails and rigging, appurtenances, appliances, inventory, parts, instruments, components, furnishings, items of equipment and accessories installed thereon, incorporated therein, or attached or related thereto, and (ii) those systems, sails and rigging, appurtenances, appliances, inventory, parts, instruments, components, furnishings, items of equipment and accessories identified by the SELLER prior to Sea Trial, and (iii) all Sailing Yacht Documentation in possession of SELLER.

**"Sailing Yacht Documentation"** shall mean all historical records, logs, manuals and documents (whether on paper, stored electronically or in any other medium) supplied or made available (or required to be supplied or made available) by the manufacturers of the Sailing Yacht and engines, including but not limited to Warranty Rights, maintenance manuals, maintenance records, wiring diagrams, illustrated parts diagrams, completion manuals, and all other logs and associated documentation for the Sailing Yacht that are in SELLER's possession or under SELLER's control.

2

**"Bill of Sale"** shall mean a Bill of Sale requested by the BUYER's registry, conveying good and marketable title to the Sailing Yacht free and clear from any Liens (defined below) from SELLER to BUYER, substantially in the form of Exhibit D attached hereto.

**"Broker 1"** shall mean GL Yachting USA Inc. with an address at 1 Washington Street Newport, RI 02840 USA.

**"Broker 2"** shall mean Alan Kelly C/O Llorenc Rossello 2 07015 Palma de Mallorca, Spain.

**"Business Day"** shall mean any day other than a Saturday, a Sunday, or any other day on which commercial banking institutions are required or authorized by law to close in the state of Delaware.

**"Closing"** shall mean the moment title is conveyed to BUYER on the Closing Date.

**"Closing Actions"** shall have the meaning specified in Section 5(c)(i).

**"Closing Date"** shall mean the Business Day on which the Closing occurs, which shall be a mutually agreed Business Day that is within five (5) Business Days after the completion of the later of (i) the Inspection and test flights; and (ii) the correction of Discrepancies by a mutually agreeable repair facility to BUYER's reasonable satisfaction.

**"Delivery Receipt"** shall mean a receipt evidencing delivery of the Sailing Yacht in the form of Exhibit C attached hereto.

**"Deposit"** shall mean the Six Hundred Seventy-Seven Thousand Seven Hundred U.S. Dollars ($677,000), which shall be held by Escrow Agent in a non-interest-bearing account.

**"Discrepancies"** shall mean all discrepancies and conditions that must be corrected by Seller by operation of Section 7 herein.

**"Escrow Agent"** shall mean, **GL Yachting USA Inc**, a Delaware Corporation, with an address at 1 Washington Street Newport, RI 02840.

**"Loose Equipment"** shall mean all equipment identified by the SELLER prior to Sea Trial.

**"Purchase Price"** shall mean Six Million Seven Hundred Seventy-Seven Thousand U.S. Dollars ($6,777,000.00 USD).

**"Warranty Rights"** shall mean any and all unexpired and assignable rights to repair or replacement granted to Seller by the original manufacture of the Sailing Yacht and each material component thereof, including pending claims under such warranties.

The remaining definitions are set forth in the body of the Agreement.

2.  Agreement to Sell and Purchase.

SELLER agrees to sell, transfer, and deliver to BUYER, and BUYER agrees to purchase from SELLER, the Sailing Yacht in accordance with the terms and conditions of this Agreement, and BUYER agrees to pay, and SELLER agrees to accept, as payment in full for the Sailing Yacht, the Purchase Price.

3. Deposit.

The DEPOSIT shall be paid upon execution of this PURCHASE AND SALE AGREEMENT and delivered to ESCROW AGENT's escrow account as the DEPOSIT towards the PURCHASE

PRICE, held subject to the terms of this AGREEMENT. Escrow Agent acknowledges that when acting in such capacity, it shall represent the interests of SELLER and BUYER equally, it shall preserve and apply the DEPOSIT as required hereby and otherwise in accordance with industry practices and procedures. BUYER may proceed with survey and other inspections of the VESSEL once collected funds are in the ESCROW AGENT'S escrow account. The balance of the PURCHASE PRICE will be paid in collected funds at the CLOSING.

    (i) Should the SELLER and BUYER agree that payment may be made in any form other than collected funds, they agree to jointly and severally indemnify and hold harmless the BROKER(S) involved from any loss or liability resulting from reliance on use of such form of payment.

    (ii) Prior to transmittal of any funds by BROKER(s), BUYER or other agreed designated party, the transmittal instructions shall be confirmed to be accurate and true, either verbally, by fax or other secured means, prior to transmittal

4. Inspection.

(A) BUYER shall be entitled to a Sea Trial and Condition Survey, at BUYER's expense, in order to determine if the Sailing Yacht is acceptable to BUYER in its sole discretion and to determine whether the Sailing Yacht conforms to the conditions specified in Section 4(a)(iii) hereof (collectively, the **"Inspections"**).

    (i) The Sea Trial shall occur at a mutually agreed location on or before **May 26, 2023**, prior to the Sailing Yacht being placed ashore for the Condition Survey. The SELLER may stipulate at which boatyard the VESSEL will depart for Seat Trial and agrees delivery to and from the boatyard, which he hereby authorizes, is at the SELLER'S sole risk and expense. Sea Trial shall be a maximum of four hours duration at a time to be mutually agreed between the parties hereto. The Sea Trial, on which BUYER shall be entitled to have up to five representatives on board, shall be conducted under the operational control of SELLER and by SELLER's qualified personnel. It is at the BUYER's discretion to take advantage of this facility. In the event that the BUYER or its nominee does not attend such Sea Trial or otherwise take advantage of this facility then the Sailing Yacht shall proceed to the Condition Survey as described in 4(b)(ii).

    (ii) Condition Survey shall be completed on or about **June 1, 2023** (BUYER not being responsible for delays in the Condition Survey that are outside the reasonable control of BUYER). The SELLER agrees that the BUYER or his agents may examine the Sailing Yacht and its inventory in a nondestructive manner.

    (iii) The BUYER agrees that the Surveyor(s) shall be employed by the BUYER, and to pay all direct costs associated with the survey, including returning the VESSEL to the same status it was in prior to the survey. BUYER further agrees that any and all claims that may arise regarding the accuracy of the survey in the transaction may not be asserted against the BROKER(S).

    (iv) For the purposes of any time limits herein, the survey shall be deemed to be

4

PPH

NS

completed immediately following completion of the physical inspection by the Surveyor. For the avoidance of doubt, the period of the Condition Survey and the completion thereof shall not depend on the production or provision of any written report by the Surveyor to the BUYER.

(v)     Once the Survey commence, SELLER shall not operate the Sailing Yacht except for:

a.     the Sea Trial; and
b.     any use associated with the correction of defects; and
c.     movement to the Delivery Location; and
d.     any operation that may be required as part of the Inspection or manufacturer's recommendations.

5. Acceptance or Rejection of the Sailing Yacht.

The BUYER shall notify the ESCROW AGENT of its ACCEPTANCE or REJECTION of the VESSEL in writing, by executing and delivering the Technical Acceptance Certificate in the form of Exhibit B, within seven (7) calendar days following completion of the Condition Survey. Upon delivery of the Acceptance Certificate, this Agreement shall become specifically enforceable by BUYER against Seller, the Deposit shall become non-refundable subject to SELLER's performance, and except as otherwise expressly provided under this Agreement, and the Deposit shall be applied against the Purchase Price at Closing subject to SELLER's having tendered the Sailing Yacht for delivery in the condition required under this Agreement. If said notice is not received by the ACCEPTANCE DATE, the BUYER shall be deemed to have accepted the Sailing Yacht and its inventory, subject to the terms, if any, of Paragraph 7. *IT IS THE BUYER'S RESPONSIBILITY TO OBTAIN ANY ASSURANCES HE REQUIRES REGARDING THE AVAILABILITY OF SATISFACTORY FINANCING AND INSURANCE PRIOR TO THE ACCEPTANCE DATE.*

6. Termination of Agreement.

If the BUYER gives notice of his intention to reject the Sailing Yacht under the terms of AGREEMENT, such notice shall constitute termination of the BUYER'S obligation to purchase and the SELLER'S obligation to sell. The BUYER and the SELLER both authorize BROKER 1 to return the deposit to the BUYER, after deducting any fees and charges incurred against the VESSEL by the BUYER, or by the BROKERS on behalf of the BUYER, including the cost of the survey and related expenses.

7. Correction of Discrepancies.

If on completion of the Condition Survey any defects (defined as a discrepancy from Exhibit A or any condition certified in writing by the Marine Surveyor to affect the ability to fully operate the Sailing Yacht as intended by the manufacturer, or affecting operational integrity of the Sailing Yacht or her machinery or her systems or renders the Sailing Yacht unseaworthy or that the cumulative cost of rectification thereof will, in the judgement of the Marine Surveyor, be more than $10,000.00 USD) in the Sailing Yacht or her machinery have been found other than those disclosed to the BUYER in writing prior to the date of this Agreement and thereby accepted by the BUYER, the BUYER may within five calendar days of completion of the Condition Survey give to the SELLER or the BROKER(s) either:

(i)     Written notice requiring the SELLER forthwith either to make good any or all of the defect(s) or alternatively in BUYER's sole discretion to make a reasonable and sufficient reduction in the Sales Price to enable the BUYER after completion of the Sale to make good the same. All agreed items of work shall

5



be completed by the SELLER without undue delay in all the circumstances and shall be carried out so as to satisfy reasonable requirements of the BUYER's Surveyor in respect of defect(s) mentioned in the Surveyor's Report and notified to the SELLER, in which case the Closing Date shall be extended by such period as the SELLER and the BUYER may agree to allow the remedial works to be completed; or

(ii)    Written notice of his/its rejection of the Sailing Yacht.

(iii)   If the BUYER shall serve written notice under clause 7(i) and if after seven days of service of such notice, one or a combination of the following circumstances applies, then then this Agreement shall be deemed terminated:

a.   the SELLER has not agreed in writing to make good without delay any defect(s) specified in such notice; or

b.   the BUYER and SELLER have not agreed in writing as to the amount by which the Sales Price is to be reduced; or

c.   the SELLER and the BUYER do not agree the period within which the remedial works are to be completed.

(iv)   BUYER shall be entitled to conduct such additional inspections as are reasonably required to verify proper correction of the defects, including an additional Sea Trial; and thereafter, will be entitled to re-submit for correction of discrepancies pursuant to this Section 7.

8. Seller's Representation.

The SELLER warrants and/or agrees as follows:

(i)    The SELLER has full power and legal authority to execute and perform this AGREEMENT, will transfer good and marketable title to the Sailing Yacht, and if necessary obtain permission, from any authority to sell the Sailing Yacht. Any party, which is a legal entity, will provide the other prior to CLOSING; 1) Articles; 2) Operating Agreement/By Laws/Partnership Agreement, identifying the authorized representative who may enter/execute agreements/documents on behalf of the legal entity; 3) proof it is in good standing under the laws of the State or other jurisdiction under which the entity has been formed; and 4) a consent action or resolution duly authorizing the entity's decision to sell the Sailing Yacht and execute the Bills of Sale.

(ii)   The Sailing Yacht will be sold free and clear of any mortgages, liens, bills, encumbrances, or claims whatsoever. If any such obligations remain outstanding at the closing, the SELLER authorizes the ESCROW AGENT to deduct the funds necessary to satisfy such obligations from the proceeds of the sale prior to remittance of the balance to SELLER.

(iii)  To deliver the Sailing Yacht and its inventory as accepted, on or before the

_PPH_

6

_MS_

CLOSING DATE at the Delivery Location.

(iv)    To pay any and all duties, taxes, fees, or other charges assessed against the Sailing Yacht by any governmental authority prior to CLOSING, and to hold harmless and indemnify the BUYER and BROKERS against any claims or actions for such fees, and to provide validation of such payments at CLOSING, upon written request by the BUYER.

(v)    To hold harmless and defend the BUYER and BROKERS against any and all claims incurred prior to CLOSING that may impair or adversely affect the BUYER'S receipt, use, and possession of the Sailing Yacht and SELLER'S possession of good and absolute title to Sailing Yacht, and to assume all costs incident to defending the BUYER and BROKERS against such claims, including their reasonable attorney's fees.

(vi)    To pay BROKERS the commission at CLOSING. SELLER authorizes the BROKERS to deduct the commission from payments received directly or indirectly from the BUYER.  Should the sale not be closed for any reason, and the SELLER transfers any interest in the Sailing Yacht to the BUYER, directly or indirectly, within two (2) years of the CLOSING DATE in this AGREEMENT, except a charter of one month or less, then the SELLER agrees to pay the BROKERS an amount equal to the commission which would have applied to the sale of the VESSEL under  this AGREEMENT.

9. <u>Buyer's Representations</u>.

The BUYER warrants and/or agrees as follows:

(i)    That they have full power and legal authority to execute and perform this AGREEMENT and to obtain, prior to CLOSING, if required, the permission of any authority to buy the Sailing Yacht. Any party, which is a legal entity, will provide the other prior to CLOSING; 1) Articles; 2) /By Laws/Partnership Agreement; and 3) a consent action or resolution duly authorizing the entity's decision to purchase the VESSEL, and

(ii)    To deliver the following at CLOSING:
    a. Collected funds payable to the SELLER, or for the SELLER'S account, in an amount equal to the balance of the PURCHASE PRICE
    b. Collected funds payable to the BROKERS, in an amount equal to any charges incurred against the Sailing Yacht by BROKERS on behalf of the BUYER, including costs related to any survey of the Sailing Yacht.
    c. Any and all documents required to complete this purchase; and

(iii)    To pay all sales and/or use taxes, now or hereafter, imposed as a result of this sale, and to indemnify the SELLER and BROKERS against any obligations to pay such taxes, and to furnish proof of such payments, upon request by the BROKERS.

(iv)    The BUYER will have the right of possession of the Sailing Yacht only



7



upon completion of the CLOSING.

10. <u>Delivery</u>.

The Sailing Yacht shall be delivered to BUYER more than 12 NM outside the territorial waters of the United States (the **"Delivery Location"**), or at a specific location to be mutually agreed between SELLER and BUYER. Movement to the Delivery Location shall be conducted under the operational control of SELLER and by SELLER's qualified personnel at SELLER's cost. The Closing shall occur on the Closing Date. BUYER shall have the right to have up to six representatives on the movement to the Delivery Location.

11. <u>Closing</u>.

The CLOSING shall take place on or before **June 9, 2023**, and will be complete when:
- (i) Parties to mutually agree on the protocols and necessary documents for closing five (5) business days after Sea Trial.
- (ii) All documents necessary to transfer good and absolute title to the VESSEL are received by the ESCROW AGENT, or Documentation Service on behalf of the BUYER; and,
- (iii) The balance of the PURCHASE PRICE is received in collected funds by the SELLER, or their designated agent.
- (iv) BUYER and SELLER agree that the full protocols of delivery will be agreed to no later than **June 7, 2023**.

12. <u>Assignment of Warranties</u>.

SELLER hereby assigns to BUYER, effective automatically as of Closing, any and all existing manufacturer, service center, vendor and other third-party warranties and service or maintenance policies which have been entered into by, or granted to SELLER with respect to the Sailing Yacht or any part thereof. SELLER shall promptly execute and deliver from time to time, at BUYER's reasonable expense, all such documents as are reasonably requested by BUYER to vest more effectively in BUYER the benefits of such manufacturer, vendor and other third party warranties and service life polices to BUYER.

13. <u>Damage or Loss of Sailing Yacht</u>. Risk of loss to the Sailing Yacht shall transfer to BUYER at, but no sooner than, the moment of Closing. If at any time prior to Closing the Sailing Yacht is destroyed or in the event of any loss or damage to the Sailing Yacht (including theft or the taking or condemnation by any authority under the power of eminent domain), other than a total loss prior to Closing which shall be governed by Section 10(d), SELLER shall promptly notify BUYER of such damage and BUYER shall, within five (5) Business Days of receipt of such notice, advise SELLER whether it, in its sole discretion, desires to (i) terminate this Agreement, in which case the Deposit shall be immediately refunded to BUYER whereupon neither party shall have any further obligation or liability to the other under this Agreement, or (ii) proceed with the purchase of the Sailing Yacht subject to the repair of the Sailing Yacht by SELLER and an appropriate mutually agreed reduction in the Purchase Price to account for any change to the fair market value of the Sailing Yacht as a result of such damage or the resulting repair (the amount of such reduction to be mutually agreed by the parties, or absent such agreement, BUYER shall again have the right to terminate this Agreement, and the Deposit shall be immediately refunded to BUYER whereupon neither party shall have any further obligation or liability to the other under this Agreement). If BUYER desires to accept delivery of the



8



Sailing Yacht once it has been repaired, SELLER shall use commercially reasonable efforts to procure the repair of such damage as soon as practicable and Closing shall take place as soon as practical after the completion of such repair; provided, however, that if such repair is not completed and the Sailing Yacht is not delivered to BUYER within twenty (20) Business Days after the notification of damage, BUYER shall again have the right to terminate this Agreement, and the Deposit shall be immediately refunded to BUYER whereupon neither party shall have any further obligation or liability to the other under this Agreement.

14. Disclaimer and Limitations.

EXCEPT AS OTHERWISE SET FORTH IN THIS AGREEMENT AND THE WARRANTY BILL OF SALE, UPON AND AFTER CLOSING THE SAILING YACHT IS BEING SOLD ON AN "AS IS" BASIS, WITH ALL FAULTS. SELLER MAKES NO WARRANTY, EXPRESS OR IMPLIED, AND SELLER SPECIFICALLY DISCLAIMS ANY AND ALL DUTIES, OBLIGATIONS AND LIABILITIES AND ANY AND ALL EXPRESS OR IMPLIED WARRANTIES OR REPRESENTATIONS OF ANY KIND OR NATURE REGARDING THE SAILING YACHT OR ANY ASPECT THEREOF, INCLUDING, BUT NOT LIMITED TO, MERCHANTABILITY, MATERIAL, MANUFACTURE, WORKMANSHIP, DESIGN OR FITNESS FOR ANY PARTICULAR PURPOSE. IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR ANY SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, HOWEVER ARISING.

15.  Termination. This Agreement may be terminated as follows:

(a)  At any time until Closing by the mutual written agreement of BUYER and SELLER.

(b)  By SELLER, if BUYER has not rejected (or been deemed to reject) the Sailing Vessel pursuant to Section 7, and shall (i) fail to satisfy the conditions set forth herein on or prior to the Closing Date and fails to cure such failure within three (3) calendar days of receiving notice of such failure (unless SELLER has waived such condition in writing or the parties have agreed in writing to extend the Closing Date), or (ii) fail to take delivery of the Sailing Yacht when tendered by SELLER in conformity with this Agreement at Closing.  In such event, SELLER may, by notice to BUYER hold BUYER in default hereunder whereupon SELLER shall have no further obligations to BUYER under the Agreement, all rights which BUYER may have or may have had in or to the Sailing Yacht or under this Agreement shall be extinguished, and all rights (including the right to sell the Sailing Yacht to another party) in and to the Sailing Yacht shall be vested with SELLER.  The parties hereby acknowledge that it would be difficult, if not impossible, to assess the damages which would be suffered by SELLER as a result of BUYER's default of this Agreement, and therefore agree that in the event of any such default by BUYER, SELLER shall be entitled to retain, as its sole and exclusive remedy the Deposit as liquidated damages, which is not intended as, nor shall it be interpreted as, a penalty.

By BUYER, if SELLER shall: (i) fail to satisfy the conditions set forth herein on or prior to the Closing Date (unless BUYER has waived such condition in writing or the parties have agreed in writing to extend the Closing Date); (ii) decline to rectify identified Discrepancies or shall fail to agree with the BUYER upon a list of Discrepancies or financial concession in lieu thereof, or (ii) otherwise fail or refuse to tender the Sailing Yacht for Closing in the condition required by this Agreement.  In such event, BUYER may, by written notice to SELLER, terminate its obligation to buy the Sailing Yacht

9

from SELLER, and SELLER shall reimburse BUYER for all documented expenses incurred in pursuit of this transaction; whereupon BUYER shall have no further obligations to SELLER under this Agreement. The parties hereby acknowledge that it would be difficult, if not impossible, to assess the damages which would be suffered by BUYER as a result of SELLER's default of this Agreement, and therefore agree that in the event of any such default by SELLER, Escrow Agent shall immediately refund to BUYER the Deposit.

      (c)  Automatically, if the (i) Sailing Yacht is destroyed or a total loss (including by theft or taking or condemnation by any public or quasi-public authority under the power of eminent domain) of the Sailing Yacht occurs or (ii) BUYER rejects the Sailing Yacht.

      (d)  In the event of damage other than total loss, in accordance with Section 13.

16.  <u>Notices</u>.

All notices and requests hereunder shall be in writing and delivered in person, by e-mail or reputable courier for overnight delivery, and shall be sent to the address set forth below (or to such other address as may be designated in writing).

| If to SELLER: | If to BUYER: |
|---|---|
| Distant Horizons LLC | MS Management LLC |
| 251 Little Falls Drive | 16192 Coastal Highway |
| Wilmington, DE, 19808 | Lewes, DE 19958 |
| Attn: Eugene E. Samarin, Esq. | Attn:  Michael C. Stock |
| Lochner Law Firm, P.C. | |
| Phone: (443) 716-4400 x3 | Phone: 888 801 6777 |
| Email: esamarin@boatinglaw.com | Email: Mike@bancroftglobal.org |

Such notice or other communication shall be deemed to have been given or made and shall be deemed to have been received in the case of a reputable overnight courier, the next Business Day; in the case of e-mail, the same day as transmitted if received during the normal business hours of the recipient or the next Business Day if received after the normal business hours of the recipient as reflected by an electronic confirmation or receipt; and in the case of personal delivery, upon actual delivery or the intended recipient's refusal to accept delivery. No objection may be made to the manner of delivery of any notice actually received by a party or authorized agent of a party.

17. <u>Governing Law</u>. This Agreement and all other related documents shall be interpreted and construed according to the laws of the State of Rhode Island applicable to contracts executed and performed within the State of Rhode Island without regard to principles of conflicts of law.

18. <u>Publicity</u>.  Neither party (nor its representatives, including any brokers) shall disclose the existence or terms of this Agreement nor use the name of the other party in any publicity, advertising or announcement without the other party's prior written approval.

19. <u>Miscellaneous</u>.

      (a)  <u>Entire Agreement</u>. This Agreement sets forth the entire agreement of the parties and supersedes any previous understanding of the parties relating to the subject matter hereof



10



between BUYER and SELLER.

(b)    Amendments. This Agreement shall not be modified or amended except by an instrument in writing signed by authorized representatives of the parties.

(c)    Headings. The headings used herein are for convenience only and shall not be considered part of any Section of this Agreement or for purposes of construing the provisions thereunder.

(d)    Survival. All representations and warranties of the parties contained in this Agreement shall survive the Closing.

(e)    Assignment; Binding Effect. This Agreement shall inure to the benefit of and be binding upon the parties and their respective successors and assigns and shall not, except as specifically provided herein, be assigned without the prior written consent of the other party, such consent not to be unreasonably withheld or delayed.

(f)    Severability. In the event that any provision of this Agreement is or shall become invalid, illegal or unenforceable under the law of any jurisdiction, then if it is possible to waive any requirements which would operate to make such invalid, illegal or unenforceable provision effective, such requirements are hereby waived by each of the parties to the extent permitted by law. All of the remaining provisions of this Agreement would remain fully valid and enforceable.

(g)    Counterparts. This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument. Such counterparts may be exchanged via facsimile transmission or electronic mail without the need for an original copy of the counterpart to be exchanged.

(h)    Language. Whenever the term "including" is used in this Agreement (whether or not that term is followed by the phrase "without limitation" or words of similar effect) in connection with a listing of one or more items within a particular classification, that listing will be interpreted to be illustrative only and will not be interpreted as a limitation on, or an exclusive listing of, the items within that classification.

(i)    Costs and Expenses. Except as specifically provided in this Agreement, each party shall bear its own costs and expenses incurred in connection with the preparation, execution, performance and enforcement of the terms of this Agreement and the transactions contemplated hereby. Without limiting the generality of the foregoing, (i) all fees and expenses associated with BUYER becoming a Transacting User at the International Registry and registering a Contract of Sale for the Sailing Yacht shall be paid by BUYER; and (ii) all fees and expenses associated with SELLER becoming a Transacting User at the International Registry and all amounts required to be paid to clear encumbrances created by or through SELLER, shall be paid by SELLER.

(j)    Waivers. No failure or delay on the part of either party hereto in exercising any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power preclude any other further exercise of any such right or power. The remedies provided herein are cumulative, and not exclusive of any remedies provided by law.

(k)    Further Assurances. BUYER and SELLER each agrees that, from time to time after the Closing Date, upon the reasonable request of the other party, it shall cooperate with the other

11

party in executing and delivering any and all such further instruments and documents, customary in a vessel sale, and take such further action as may be necessary to carry out the intent of this Agreement and the terms hereof.

(l)    Agreement Negotiated.  The parties are sophisticated and have been represented or had the opportunity to be represented in connection with the negotiation and performance of this Agreement.  Consequently, the parties do not believe that any presumptions relating to the interpretation of contracts against the drafter of any particular clause should be applied in this case and, therefore, waive their effects.

(m)    No Marketing.  SELLER represents, warrants and confirms that it has removed the Sailing Yacht from the market and that unless this Agreement is terminated in accordance with its terms, neither SELLER nor its agents shall (i) offer to sell the Sailing Yacht to any other party, (ii) solicit or encourage any offers to purchase the Sailing Yacht or (iii) accept or negotiate the terms of any offer or agreement with respect to the sale or other transfer of the Sailing Yacht whatsoever.

SIGNATURES ON NEXT PAGE



12



IN WITNESS WHEREOF, the parties hereto have affixed their signatures as of the day and year first above written.

SELLER:                                          BUYER:

By: _Paul P Huffard_                             By: _Michael Stock_
Name: Paul P Huffard                             Name: Michael C. Stock
Title: Member and Manager                        Title: Director


CONSENT AND JOINDER:

The undersigned, GL Yachting USA Inc. does hereby consent to and join in the foregoing Agreement hereby agreeing to act as Escrow Agent in accordance with the provisions of the Agreement applicable to the Escrow Agent, subject to the terms and conditions attached hereto as Exhibit E. The Escrow Agent fees for this transaction are $10.

Escrow Agent:
GL YACHTING USA INC

By: _____

Print: _____

Title: _____



# Exhibit A. Vessel Inventory

Buyer: MS Management LLC          Seller: Distant Horizon LLC




## Architect and Designers

- Naval Architect: VPLP Design
- Exterior Design: Christophe Chedal-Anglay and Patrick le Quément
- Interior Design: Christophe Chedal-Anglay

## Construction

- Built in France 2019 to CE Category 'A' requirements

## Hull, Deck and Coachroof Construction

- Constructed in female molds
- Vacuum-bagged, infused epoxies, foam sandwich core construction with carbon-fiber skins, post-cured for maximum strength
- Thermoformed Corecell hull core
- Watertight bulkheads to seal off bow and stern compartments
- Bilges compartmentalized in each hull
- Straight symmetric, daggerboards
- Carbon fiber pre-preg major structural bulkheads and chain plates

## Paint and Finishes

- Acrylic urethane high-gloss yacht exterior paints
  - Custom blue/gray topsides (N2 7721)
  - Solid gloss deck paint
  - Custom mixed non-skid paint Matterhorn White
  - Safety Hull Nonskid on the underside of bridge deck (Rochelle Red L7O11)
- Interior finishes are a combination of synthetic leather wall/ceiling coverings and gloss painted surfaces
- Rolled dark gray epoxy barrier paint on surfaces in machinery bilges
- Rolled light gray epoxy barrier paint on surfaces in nonliving areas (i.e. tech spaces/lockers)
- Hard Epoxy Paint on appendages (Black)
- Corian Deep Black Quartz work counters in galley and heads
- All interior floors are constructed in synthetic high-pressure laminate
- Walnut interior furniture veneers on Nomex core sandwiched with pre-preg-carbon panels
- All joinery surfaces finished in open-grain satin varnish



## Spars

- Standard Cruising Rig Package:
  - 25m pre-preg high modulus mast by Lorima
  - Rigging Project 12T automatic main halyard lock including detachable headboard plate
  - Carbon fiber spreaders (1 level)
  - (3) reef points
  - 1:1 Halyards with locks (J3, J1 and A3 sails)
  - Furling solent lashed when raised
- Carbon fiber gooseneck with stainless steel pin
- Conduit socks for mast electrical cables
- Mounting plates for standard electronics at masthead
- (2) Spreader down lights

- **Boom:** Carbon fiber medium modulus Lorimar boom
- (3) Reef lines with locks
- Preventer to function as  Emergency Mainsheet purchase 2:1
- Lazy jacks to spreaders

- **Longeron:** Custom carbon fiber medium modulus section
- Integral anchor roller and storage
- 6:1 tack outhaul for J3, J1, Jo and 3:1 A3/A4 sails
- PBO whisker stays

- **Forward Crossbeam:** Carbon fiber medium modulus section
- Carbon Fiber martingales led through beam to hull sides

## Standing Rigging

- Full ECSix carbon standing rigging: Cap Shrouds and Diamond stays with loops to chainplates
- PBO headstay with single line structural Facnor furler
- (2) ECSix diamond shrouds
- Facnor custom racing furlers and locks
- Dyneema control lines and halyards equipped with lashing ends that include:
  - Mainsheet
  - Traveler lines
  - (3) 2:1 Reef lines
  - 2:1 Self-tacking jib sheet
  - Code sail sheets
  - (2) J1/J3 Sheets





- ○ Tack lines for J3,J1 and A3
- ○ Furling lines for J3,J2 and A3
- ○ 1:1 Main halyard
- ○ (3) 1:1 J3, J1 and A3 halyards
- ○ Hydraulic Cunningham
- ○ Daggerboard up and down lines
- ○ Lazy jacks

## Sailing Hardware

- ◆ Deck layout optimized for shorthanded sailing
- ◆ (2) Low Profile Harken 990 3-speed Primary winches
- ◆ (2) Harken Performa winches in forward cockpit
- ◆ (2) Harken Performa winches on aft beam
- ◆ Mainsheet traveler system on aft beam controlled by electric line driver
- ◆ (2) Kill switches for winches forward and aft
- ◆ Self-tacking Solent jib sheet system
- ◆ Sail sheet systems for J3, J1, and 'A' sails with sheets lead to forward or aft cockpit winches
- ◆ Mast-base blocks
- ◆ Dyneema knotless mesh forward trampolines

## Hydraulics

- ◆ Cruising Hydraulics: Custom Cariboni hydraulics package for mainsheet and cunningham

## Salon

- ◆ Salon features a u-shaped galley, dining/lounge area, central helm and navigation station
- ◆ Galley located on the port side of the salon
- ◆ Navigation station located starboard forward of the salon including:
  - ○ Panel-mounted navigation displays
  - ○ Charging stations
  - ○ Manual engine throttle controls
- ◆ Central helm station located central forward of the salon including:
  - ○ 43"/110cm carbon fiber wheel
  - ○ Overhead retractable moonroof for added ventilation
  - ○ Compass
  - ○ Horn button
- ◆ Access through watertight doors to the forward cockpit
- ◆ Access through double sliding doors to the aft cockpit
- ◆ Access to the hull living spaces via single companionways on port and starboard





## Galley

- Galley located on port side of the salon
- U-shaped galley which includes:
  - (2) Double pull-out drawer units (fridge/fridge and freezer/freezer)
  - Smeg 4-burner gas stove along port outboard side
  - Gas oven alongside aft bulkhead
  - Microwave
  - Boiling water on demand
  - Double stainless steel sink with mixer located forward
  - Washing Machine (located in the companionway)

## Forward Cockpit

- Yeti Cooler with Seat

## Aft Cockpit and Transom

- Entertaining aft cockpit that includes:
  - L-shaped seating with coffee table to port that lowers into daybed (with cushion)
  - L Shaped seating with fixed Dining table to starboard
  - Cushioned loungers on upper deck level, located port and starboard
- Custom aft beam wtih BBQ and drinks fridge on port, freezer and sink on starboard
- Aft beam integrated seating with storage for life rafts
- Pullout hot/cold freshwater shower at port and starboard transoms
- (2) Liferaft storage slots in aft beam (owner supplied SOLAS Liferafts)
- Removable swim ladder with clipping point on each transom

## Master and Guest

- (4) Spacious VIP luxury staterooms
- All staterooms have European queen-sized beds (61"x80"x5" / 155x203x13cm)

- Perennials headboard wrap around
- Hanging closet
- (2) Bedside reading lights
- Electrical outlets and USB charging ports
- Overhead hatches for ventilation
- Opening portlights in each cabin (inboard or aft)




## Master and Guest Staterooms - Head/Showers

- (4) Clean and modern heads
- (3) Separate standup shower compartments

## Crew Quarters and Head

- Crew head and wet shower located on the port side forward of the crew cabin
- Two bunk bed berths with storage below

## Propulsion

- (2) 80-hp Yanmar marine diesel engines
- (2) SD60 Yanmar Saildrives
- (2) 3-blade Gori folding propellers with Overdrive function
- (2) Start batteries
- (1) Electrical ZF Mini throttle
- MaxPower retractable bow thruster (13KW 24V)
- (2) 100gal/378L polyethylene diesel fuel tanks
- Automatic shutoff Keenan filter boss system with Alarm and switchover valve
- Automatic Firefighting system in engine rooms

## House Energy System

- CZone central networked power control and monitoring system
- Touch screen at Nav station
- (2) 150A high output 24V engine alternators
- (4) 180Ah Lithium Ion batteries (720Ah total capacity)

- 3kW solar panel system with charge controllers
- 3.5kW 24V/240V combination inverter and charger
- Additional 240V 3.5KW Combi inverter
- Waterproof boxes and cabling required by CE
- Digital tankage monitors for water, fuel, and waste
- Alarms functions:
    - Bilge
    - Fire
    - Tank levels
- Cabin and saloon Aircon
    - Cabins (4) 8000 BTU & (1) 6000 BTU
    - Saloon (2) 18000 BTU
- 220v & 110v dual voltage outlets throughout the vessel





DocuSign Envelope ID: 33E16606-F1FA-4A0C-B12B-39EB3CED593D

## Lights

- All LED lighting dimmable throughout the interior of the boat with light switches in practical locations
- LED courtesy and strip lights
- Flush LED spot lights
- LED reading lights located in cabins (2 per cabin)
- LED navigation lights
  - (2) Underwater lights in aft inner hulls

## Electronics

- B&G Zeus H5000
- (2) 19" Touch displays (2021) at helm station with functions such as chart plotting, radar, AIS, all sailing instruments, and pilot controls
- (6) Additional electronic displays:
  - (4) Mast 20/20 displays
- GPS Antenna
- Dual depth/speed
- Gyro 3-axis sensor
- Broadband radome on starboard spreader
- VHF with DSC
- AIS system
- 3D motion Autopilot Compass and Barometer

## Entertainment

- Fusion Audio speaker system in salon and aft cockpit

## Steering System

- (2) Retractable high aspect carbon rudders
- (2) Pintle style rudder bearings with rudder hold-up mechanism and passive rake adjustment
- Mechanically linked torsional tube steering system and gearbox steering system from helm to rudders
- 43"/110cm carbon fiber sculptured race boat steering wheel
- Dual autopilot system with crossover switch





DocuSign Envelope ID: 33E16606-F1FA-4A0C-B12B-39EB3CED593D

## Plumbing and Tanks

- (2) 100gal polyethylene water tanks
- Spectra Newport 700GPD 24V watermaker
- (2) 13gal/50L hot water heaters with engine heating loop
- (2) 55gal/21OL waste tanks amidships and (2) 24gal/90L waste tanks fwd in sail locker
- Salt/fresh water washdown for decks
- (6) Electric bilge pumps and (1) emergency portable petrol crash pump
- All Marelon (or equivalent) flush mounted thru-hull fittings below waterline
- Tank gauges and monitoring system linked to CZone display

## Visibility and Ventilation

- Tempered safety glass salon windows outboard and forward
- Aft double doors slide to port
- (2) Swing doors between salon and forward cockpit
- Moonroof over the helm
- Tempered safety glass fixed hull windows
- Flush deck hatches with integral drains:
  - (4) Size 20 hatches located over amidship heads
  - (2) Size 44 escape hatches
  - (6) Size 60 hatches located over Cabins and Owner's head
  - (2) Size 10 hatches located over amidships berths
  - (3) Custom Seasmart hatches over foredeck lockers
- (10) Flush opening portlights

## Bow Lockers

- Large storage in port and starboard bow areas for sails, hoses, fenders, etc.

## Docking and Anchoring

- (8) Dock lines with chafe protected eyes (75' x 1"/22.8m x 25mm)
- (10) Inflatable fenders with covers (18" x 60"/.5m x 1.5m)
- (3) Larger inflatable fenders
- (1) Main cruising anchor: Ultra 60kg with 12mm chain (galvanized)
- (1) Backup anchor: Fortress Aluminum 47lb/21kg
- Lewmar V4 electric windlass system
- Anchor rodes:
  - (1) 75m (7/16") 11mm chain (Acco Peerless Chain 2021)
  - (1) 30'/9.1m of 3/8"/10mm chain with 150'/45.7m of nylon rode



## Sail Package

- North Sails Performance Cruising Wardrobe
- Mainsail: 3Di Endurance 760 142m2
  - (6) CTech Carbon Battens
- J2 (Furling): 3Di Endurance 760 73m2
- J3 (Furling): 3Di Endurance 760 47m2
- J0 (Furling): 3Di Endurance 760 130m2
- A3 (Furling) NPL Xi06 231m2
- A4 2021 (snuffer sock)
- Storm Jib

## Canvas

- Sunbrella/Ultraleather canvas coverings on all seat cushions, as per yard sample.
- Loft Custom Canvas Package including: Sail Bag, seat cushion covers, crew covers, tender console cover

## Galley & Linens

- Miscellaneous crockery, kitchenware and linens

## Safety

- (2) SOLAS 6 person life raft
- (2) Jon Buoys
- Jacklines
- Inflatable PFD
- Personal AIS
- (3) EPIRB
- (2) Full set of offshore flare kits
- (1) Emergency VHF
- (1) Handheld satellite phone
- (2) Grab Bags

## Additional Equipment

- Custom Pure 450 G2 Waterman Carbon Tender with Yamaha F70LA (Serial# 1084981)
- Sail covers and bags
- Removable chafe protection. (4) Carbon covers with foam backing that clip over the 4 cleats
- Digital Safe
- Carbon Passerelle EXIT engineering
- INMARSAT Fleet One Satellite communication
- Watt and Sea Hydro generator
- Dive compressor





DocuSign Envelope ID: 33E16606-E1FA-4A0C-B12B-39EB3CED593D

**EXHIBIT B**
**SAILING YACHT TECHNICAL ACCEPTANCE CERTIFICATE**

MS Management LLC (**"BUYER"**), hereby acknowledges that, pursuant to the Sailing Yacht Purchase Agreement (the **"Agreement"**) dated as of the _____ day of May 2023 entered into by and between BUYER and Distant Horizons LLC (**"SELLER"**), BUYER has completed the Sea Trial and the Condition Inspection, as defined in the Agreement. BUYER has determined that:

The Sailing Yacht is hereby accepted in accordance with the terms of the Agreement, subject to the proper correction of any and all defects, as defined in the Agreement. BUYER acknowledges that the Deposit will upon signature below become non-refundable, except as otherwise provided in the Agreement.

**IN WITNESS WHEREOF**, BUYER has executed this Sailing Yacht Technical Acceptance Certificate as of this _____ day of _____, 2023.

BUYER:
MS Management LLC

By: _____

Name: Michael C. Stock
Title:

**EXHIBIT C**
**SAILING YACHT DELIVERY RECEIPT**

Make and Model:

Serial Number:

Registration Number:

Delivery Location:        _____

Date of Delivery:         _____

Time of Delivery:         _____


THIS IS TO CONFIRM that pursuant to the Sailing Yacht Purchase Agreement by and between Distant Horizons LLC (**"SELLER"**), and MS Management LLC (**"BUYER"**) dated as of the \_\_\_\_ day of May 2023, at the date and time set forth above, SELLER has delivered, and BUYER has accepted the above-referenced Sailing Yacht.

IN WITNESS WHEREOF, the undersigned has caused this instrument to be duly executed and delivered.

PURCHASER:

MS Management LLC


By: _____
Name: Michael C. Stock
Title: _____

*Exhibit C*

**EXHIBIT D**
**Warranty of Title**

*Exhibit D*

# EXHIBIT E

*Exhibit E*